IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA and THE STATE OF HAWAII ex rel. BETHANY J. LEWIS, <br><br>         Relator, <br><br>   vs. <br><br> HONOLULU COMMUNITY ACTION PROGRAM, INC., ET AL., <br><br>         Defendants. | Civ. No. 16-00062 JMS-KJM <br><br> ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, ECF NO. 76 |

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, ECF NO. 76**

**I. INTRODUCTION**

Defendants Honolulu Community Action Program, Inc. ("HCAP");

Honolulu Community Action Program, Inc., dba, HCAP Head Start ("HCAP HS");

and certain individual Defendants[1] affiliated with HCAP or HCAP HS

(collectively, "Defendants") move for summary judgment on all remaining counts

in this qui tam action brought under 31 U.S.C. § 3730(b) by Relator Bethany J.

---

[1] The individual Defendants are Robert N.E. Piper, in his individual capacity and as Executive Director of HCAP; Lynn K. Cabato, in her individual capacity and as Director of HCAP HS; Robyn Antonucci, in her individual capacity and as Assistant Director of HCAP HS; Donna Manibog, in her individual capacity and as Assistant Director of HCAP HS; and Sonia Chan, in her individual capacity and as Information Technology Manager of HCAP HS.

Lewis ("Relator").[2]  ECF No. 76.  After fully considering all written and oral argument, the court GRANTS the motion.

## II.  BACKGROUND

HCAP HS is a private non-profit company that receives federal grants to provide services promoting the school readiness of qualifying children from low-income families through a Head Start program.  Compl. ¶¶ 23 to 27, ECF No. 1 at PageID #8-9; Kogami Decl. ¶ 3, ECF No. 76-5 at PageID #641-42.  As summarized in the September 13, 2018 Order, this action alleges violations by Defendants of the federal False Claims Act (the "FCA"), 31 U.S.C. § 3729 et seq., and Hawaii's False Claims Act, Hawaii Revised Statutes § 661-21 et seq., regarding enrollment levels of students in HCAP HS.  Specifically, Relator alleges a scheme whereby Defendants used "ghost children"—described as children who had applied to the Head Start program but were either not actually enrolled in the program or had been dropped from the program—to increase falsely HCAP HS's enrollment levels to obtain Head Start funding from the United States Department of Health and Human Services.  ECF No. 1 at PageID #4-5, 11-17.

---

[2]  On September 13, 2018, the court dismissed Counts Three and Six, alleging conspiracy under federal and state law.  *See* Order Granting in Part and Denying in Part Defendants' Motion to Dismiss, ECF No. 53 (the "September 13, 2018 Order").

Relator alleges that from the 2009-10 to 2015-16 school years, HCAP HS was required to enroll from 1,650 to 1659 children (as indicated in its grant awards) to maintain its funding. *Id.* at PageID #11 to 12; *see also* ECF No. 76-9. For these school years, Relator alleges that HCAP HS inflated the enrollment numbers by wrongfully including the following groups in its enrollment: (1) children who applied but were never enrolled; (2) children who applied but did not qualify; and (3) children who were enrolled without completing the proper enrollment procedures. ECF No. 1 at PageID #12. Relator alleges several different tactics that Defendants used to falsify the enrollment numbers. *See id.* at PageID #12 to 17. The court discusses specific evidence (or lack thereof) supporting Relator's claims, and the specific legal and regulatory context, only as necessary when addressing the arguments of the parties in the Discussion section to follow.

The counts remaining after the September 13, 2018 Order are:

- Count One (violations of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A));

- Count Two (violations of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B));

- Count Four (violations of the Hawaii False Claims Act, Haw. Rev. Stat. § 661-21(a)(1)); and

- Count Five (violations of the Hawaii False Claims Act, Haw. Rev. Stat. § 661-21(a)(2)).

On June 10, 2019, Defendants filed their Motion for Summary Judgment, arguing that they are entitled to judgment as a matter of law and that Relator has insufficient evidence, if any, to support all elements of her claims. ECF No. 76.  On August 26, 2019, Relator filed her Opposition, ECF No. 79, and Defendants filed their Reply on August 30, 2019, ECF No. 81.  The court heard the motion on September 17, 2019.

### III.  <u>STANDARD OF REVIEW</u>

Summary judgment is proper where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Rule 56(a) mandates summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Broussard v. Univ. of Cal. at Berkeley*, 192 F.3d 1252, 1258 (9th Cir. 1999).

"A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact."  *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) (citing *Celotex*, 477 U.S. at 323); *see also Jespersen v. Harrah's Operating Co.*, 392 F.3d 1076, 1079 (9th Cir. 2004).  "When the moving party has

carried its burden under Rule 56[(a)] its opponent must do more than simply show that there is some metaphysical doubt as to the material facts [and] come forward with specific facts showing that there is a *genuine issue for trial*." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (citation and internal quotation marks omitted).

"An issue is 'genuine' only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party, and a dispute is 'material' only if it could affect the outcome of the suit under the governing law." *In re Barboza*, 545 F.3d 702, 707 (9th Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). When considering the evidence on a motion for summary judgment, the court must draw all reasonable inferences in the light most favorable to the nonmoving party. *Friedman v. Live Nation Merch., Inc.*, 833 F.3d 1180, 1184 (9th Cir. 2016).

## IV. <u>DISCUSSION</u>

### A. **The State Law Claims Fail**

Initially, Counts Four and Five—the Hawaii False Claims Act claims—fail as a matter of law.[3] Defendants proffer undisputed evidence that no

---

[3] The Hawaii False Claims Act imposes liability against a person who, among other acts:

(1) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or]

(continued . . . )

State of Hawaii funds were ever at issue.  *See* Kogami Decl. ¶ 4, ECF No. 76-5 at

PageID #642 ("[T]he State does not pay any amount to HCAP and HCAP HS does

not bill the State for any amounts related to the Head Start program.  The State of

Hawaii did not provide any funding for HCAP's Head Start grants for the School

years . . . 2014 through 2018."); Piper Decl. ¶ 7, ECF No. 76-6 at PageID #646

("Head Start grants do not and never have included any monetary payments from

the State of Hawaii."); Cabato Decl. ¶ 6, ECF No. 76-7 at PageID #649 ("[F]rom

2010 to 2017, Head Start grants did not include any monetary payments from the

State of Hawaii.").

   Relator offered no evidence contradicting these statements in her

opposition, and she acknowledged at the September 17, 2019, hearing that she has

no such evidence.  Accordingly, Defendants cannot be liable for violating Hawaii's

False Claims Act—they could not have made a "claim" under the Hawaii Act.  *See*

Haw. Rev. Stat. § 661-21(e) (defining "claim" as requiring, among other things,

that "*the State* provides or has provided any portion of the money or property that

is requested . . . or will reimburse the contractor, grantee, or other recipient for any

---

(. . . continued)

   (2) Knowingly makes, uses, or causes to be made or used, a false
   record or statement material to a false or fraudulent claim[.]

Haw. Rev. Stat. § 661-21(a).

portion of the money or property that is requested") (emphasis added).  The motion

is GRANTED as to Counts Four and Five.

**B.      The Federal False Claims Act Counts Fail**

As relevant to this case, the FCA imposes liability against any person

who:

> **(A)** knowingly presents, or causes to be presented, a false or
> fraudulent claim for payment or approval; [or]
>
> **(B)** knowingly makes, uses, or causes to be made or used, a
> false record or statement material to a false or fraudulent
> claim[.]

31 U.S.C. § 3729(a)(1).  For these purposes, a "claim" is defined in part as:

> **(A)** . . . any request or demand, whether under a contract or
> otherwise, for money or property and whether or not the United
> States has title to the money or property, that—
>
> **(i)** is presented to an officer, employee, or agent of the United
> States; or
>
> **(ii)** is made to a contractor, grantee, or other recipient, if the
> money or property is to be spent or used on the Government's
> behalf or to advance a Government program or interest, and if
> the United States Government—
>
>> **(I)** provides or has provided any portion of the money or
>> property requested or demanded; or
>>
>> **(II)** will reimburse such contractor, grantee, or other
>> recipient for any portion of the money or property which
>> is requested or demanded[.]

31 U.S.C. § 3729(b)(2)(A).

Count One alleges violations of § 3729(a)(1)(A) and Count Two alleges violations of § 3729(a)(1)(B). The court analyzes each count in turn.

### 1. Count One Fails for Lack of Evidence of a "Claim for Payment or Approval"

Defendants argue that Count One fails as a matter of law because (among other reasons) Relator has no evidence that Defendants actually presented a claim "for payment or approval." *See* 31 U.S.C. § 3729(a)(1)(A) (creating liability against "any person who . . . knowingly presents, or causes to be presented, a false or fraudulent *claim for payment or approval*") (emphasis added). The court agrees.

#### a. No "claim for payment" or presentment of such a claim

Relator has no evidence that any Defendant presented or submitted an invoice or billing or other similar document (whether false or not) to the United States (or any employee or agent of the United States) seeking payment or approval of any payment. And without a claim for payment—regardless of the alleged existence of fraud—there can be no violation of the FCA. *See, e.g.*, *United States v. Kitsap Physicians Serv.*, 314 F.3d 995, 1002 (9th Cir. 2002) ("[Relator] must show '*an actual false claim* for payment being made to the Government.'") (quoting *United States ex rel. Clausen v. Lab. Corp. of Am.*, 290 F.3d 1301, 1311 (11th Cir. 2002)). "Without the *presentment* of such a claim, while the practices of

an entity that provides services to the Government may be unwise or improper, there is simply no actionable damage to the public fisc as required under the False Claims Act." *Clausen*, 290 F.3d at 1311 (citing *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 785 (4th Cir. 1999)).

At most, Relator proffers her declaration and accompanying charts prepared for litigation re-stating the allegations of the Complaint for the 2014-15 and 2015-16 school years—but without attaching any supporting documents such as notes or specific attendance records, i.e. without actual evidence. Specifically, Relator's Exhibits 3 through 16 are nothing more than pie charts and tables that duplicate the Complaint's allegations in a different form. Some of the charts refer to spreadsheets that refer to particular children that Defendants allegedly fraudulently counted in enrollment numbers (*see, e.g.*, ECF No. 79-8 at PageID #896), with summaries that in turn cite to "participant notes," "screen shots," and "attendance records." But, again, those supporting documents are not included in the record. In short, there is no admissible evidence opposing Defendants' motion. *See* Adv. Comm. Note to Fed. R. Civ. P. 56(c)(1)(A) (explaining that where an opposing party's declaration refers to documents not in the record, those materials must be placed in the record); *Nigro v. Sears, Roebuck & Co.*, 784 F.3d 495, 497 (9th Cir. 2015) ("The district court can disregard a self-serving declaration that states only conclusions and not facts that would be admissible evidence.")

(citations omitted); *F.T.C. v. Publ'g Clearing House, Inc*., 104 F.3d 1168, 1171 (9th Cir. 1997) ("A conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact.").

In any event, even if the court were to consider the references in Relator's summaries as proper evidence of falsified enrollment figures, none of them indicates that claims for payment were actually made to the federal government. "It is not enough for [Relator] 'to describe a private scheme in detail but then to allege simply and without any stated reason for [her] belief that claims requesting illegal payments must have been submitted.'" *Kitsap Physicians Serv.*, 314 F.3d at 1002 (quoting *Clausen*, 290 F.3d at 1311). "The [FCA] . . . focuses on the submission of a claim, and does not concern itself with whether or to what extent there exists a menacing underlying scheme." *Id.* (citation omitted). That is, "[v]iolations of laws, rules, or regulations alone do not create a cause of action under the FCA. It is the false certification of compliance which creates liability when certification is a prerequisite to obtaining a government benefit." *United States ex. rel Hopper v. Anton*, 91 F.3d 1261, 1266 (9th Cir. 1996) (citations and emphasis omitted). *See also, e.g.*, *Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011) ("The FCA attaches liability, not to the underlying fraudulent activity or to the government's wrongful payment, but to the 'claim for payment.'") (quoting *United States v. Rivera*, 55 F.3d 703, 709 (1st Cir. 1995)

(square brackets omitted). Indeed, Defendants point out that Relator admitted during her deposition that her Complaint is not based on the submission of false billings or claims, but rather is based on submission of allegedly false enrollment numbers for the first day of a school year. *See* ECF No. 76-11 at PageID #693-94, 698.

### b. *The Head Start grant applications and monthly reports*

Relator argues that her theory is that the Head Start grant *application* itself, which must have been submitted to the government in some form,[4] was asking for money and was thus a "claim" for purposes of § 3729(b)(2). *See* ECF No. 79 at PageID #830 (arguing that "HCAP's submission of an application for [a] Head Start grant is a form of request, which falls squarely with (sic) the definition of 'claim' under 31 U.S.C. § 3729(b)(2)(A)"). But this theory fails for at least two reasons.

If the theory is that the *initial* grant application for Head Start funding was a "claim," Relator has no evidence that the initial enrollment figure of 1650 (as listed on the 2010-11 grant award, ECF No. 76-9 at PageID #653—the only document for that year from which the court can infer that HCAP presented an

---

[4] Neither the initial grant application, nor any renewal application, is part of the record. Relator thus asks the court to infer that enrollment figures must have been part of such applications.

enrollment figure to a federal agency) was incorrect, much less fraudulent. All of

Relator's charts and summaries refer to enrollment in 2014 or 2015 (not 2010 or

2011). And she admits in her opposition that she has no evidence "at this time"

(i.e., when the opposition was filed on August 27, 2019) regarding prior school

years. *See* ECF No. 79 at PageID #832. She only assumes that if the alleged fraud

occurred in 2014 or 2015, it "most likely" occurred earlier. *Id.* at PageID #832-33

(Relator's opposition arguing that "[a]lthough it is true that there is no evidence <u>at</u>

<u>this time</u> related to these [prior] school years, the extent, magnitude, and

complexity of the fraudulent practices used . . . in the school years 2014/2015 and

2015/2016 clearly and unequivocally show that HCAP HS most likely engaged in

the same fraudulent practices in the school years 2010 through 2014, for a financial

gain"). Her assumptions and arguments, however, are not *evidence*. *See, e.g.*,

*Flaherty v. Warehousemen, Garage & Serv. Station Emps. Local Union No. 334*,

574 F.2d 484, 486 n.2 (9th Cir. 1978) ("Legal memoranda and oral argument, in

the summary-judgment context, are not evidence, and do not create issues of fact

capable of defeating an otherwise valid motion for summary judgment.").

And even if Relator's theory is that the enrollment figure of 1659

(listed on the grant award for the 2014-15 or 2015-16 school years, ECF No. 76-9

at PageID #671, 675) was false for the *renewal* of the Head Start grant, she still

lacks specific evidence of what "claim" was submitted, and what representations

regarding enrollment were made.  More importantly, even if the court infers from the renewal of the grant award itself that HCAP HS must have certified an enrollment of exactly 1659 as part of the grant process, Relator's theory still fails.

Defendants explain (without contradiction) that, under Head Start's statutory and regulatory scheme, payment under the grant is not based on actual enrollment on the first day of the school year or on any given month.  That is, reports of actual enrollment are not submitted for the purpose of payment.  And even if the required *periodic* reports of actual enrollment, *see, e.g*., 42 U.S.C. § 9836a(h)(2), are lower than funded enrollment, they would not—without several other subsequent and independent occurrences—lead to a reduction or curtailment of Head Start funds.  This reasoning requires an understanding of the basic Head Start grant process, and the role enrollment plays in it.  The court thus sets forth the relevant statutory and regulatory context.

A Head Start grant application is based on a "community assessment," which must include, among other information, "[t]he number of eligible infants, toddlers, preschool age children, and expectant mothers, including their geographic location, race, ethnicity, and languages they speak," 45 C.F.R. § 1302.11(b)(1)(i), as well as children who may be homeless, in foster care, or have disabilities, *see id.* § 1302.11(b)(1)(i)(A) to (C).  Eligibility is based primarily on several factors: family income being below the federal poverty line, families receiving certain

public assistance payments, or children being homeless or in foster case.  *See* 45 C.F.R. § 1302.12(c).  Based on such a community assessment, HCAP obtained a grant to provide Head Start services with a "funded enrollment" or "client population" of from 1650 to 1659 children per school year from at least 2010 to 2018.  *See* ECF No 76-9 at PageID #653 to 675.

A Head Start program "must maintain its funded enrollment level and fill any vacancy as soon as possible [and] must fill any vacancy within 30 days." 45 C.F.R. § 1302.15(a).  And it "must make efforts to maintain enrollment of eligible children for the following year."  45 C.F.R. § 1305.15(b).  Accordingly, a Head Start program "must develop at the beginning of each enrollment year and maintain during the year a waiting list that ranks children according to the program's selection criteria."  45 C.F.R. § 1302.14(c).[5]

The Secretary of Health and Human Services monitors Head Start grantees for compliance.  As part of that monitoring process, grantees must report their enrollment monthly.  *See* 42 U.S.C. § 9836a(h)(2) ("Each entity carrying out a Head Start program shall report on a monthly basis to the Secretary and the relevant Head Start agency—(A) the actual enrollment in such program; and (B) if

---

[5]  The undisputed evidence establishes that Defendants maintained such a waiting list, and in fact filled (within 30 days) any vacancies that may have occurred in enrollment lists that were established on the first day of the school year.  *See* ECF No. 82-6.

such actual enrollment is less than the funded enrollment, any apparent reason for

such enrollment shortfall.").[6]  But only if actual enrollment is less than funded

enrollment for "not less than 4 consecutive months" as reviewed on a "semiannual

basis" is there a potential consequence.  *See* 42 U.S.C. § 9836a(h)(3)(A).  Such an

enrollment shortfall triggers development by the Secretary, "in collaboration with

[the Head Start grantee,] [of] a plan and timetable for reducing or eliminating

underenrollment taking into consideration" a host of statutorily-defined factors.  *Id.*

---

[6] The Head Start statute defines the term "actual enrollment" as "the actual number of children enrolled in such program and reported by the agency (as required in [§ 9836a(h)(2)]) in a given month."  42 U.S.C. § 9836a(h)(1)(A).  And it defines "funded enrollment" as "the number of children that the agency is funded to serve through a grant for the program during such fiscal year, as indicated in the grant agreement."  42 U.S.C. § 9836a(h)(1)(C).

In turn, the Head Start regulations currently define the term "enrolled (or any variation of)" as meaning "a child has been accepted and attended at least one class for center-based or family child care option or at least one home visit for the home-based option."  45 C.F.R. § 1305.2 (Oct. 1, 2018).  But the regulatory definition has changed over the relevant timeframe. In 2015, the regulations defined "enrolled" as meaning:

> a child has been accepted and attended at least one class, has received at least
> one home visit, or has received at least one direct service while pending
> completion of necessary documentation for attendance in a center, based on state
> and local licensing requirements.  For Early Head Start, enrollment includes all
> pregnant women that have been accepted and received at least one direct service.

45 C.F.R. § 1305.1 (Oct. 1, 2016) (reprinted at ECF No. 76-15 at PageID #802); ECF No. 38-4 at PageID #178 (setting forth effective date of March 12, 2015).  And prior to that, "enrollment" meant: "the official acceptance of a family by a Head Start program and the completion of all procedures necessary for a child and family to begin receiving services."  45 C.F.R. § 1305.2(b) (Oct. 1, 2010) (reprinted at ECF No. 76-14 at PageID #793); ECF No. 38-3 at PageID #175.

Given these definitions, Defendants acknowledge—and without specific contradictory evidence from Relator—that "HCAP HS previously used the term 'ghost children' in connection with certain students whom HCAP enrolled automatically to comply with Head Start regulations," Kogami Decl. ¶ 2, ECF No. 82-1 at PageID #1204, where "[t]hose students included: Second-year kindergarteners; repeat enrollers from previous school years; children in foster care; and homeless children."  *Id.*

§ 9836a(h)(3)(B) (footnote omitted).  And then, only if "after receiving technical assistance and developing and implementing the plan . . . for 12 months," *id.* § 9836a(h)(5)(A), and only if actual enrollment is "less than 97 percent of its funded enrollment," *id.*, may the Secretary then designate the Head Start grantee as "chronically underenrolled," and possibly "recapture, withhold, or reduce the base grant for the program" on a percentage basis, *id.* § 9836a(h)(5)(A)(i) & (ii).  That is, even for a "chronically underenrolled" grantee, the Secretary may still waive any reductions in funding based on several discretionary factors such as "serving significant numbers of highly mobile children" or that the enrollment shortfall is expected to be temporary or is not significant.  *Id.* § 9836a(h)(5)(B)(i) to (iii).

Given this statutory and regulatory framework, Relator's theory—that submission of allegedly falsified enrollment data (either initially, or in the grant renewal process, or in monthly enrollment reporting) constitutes a "claim for payment or approval"—necessarily fails.  In this context, payment (or even a reduction in payment) was not contingent on the enrollment reporting.  Even assuming there were a disputed factual question over whether the enrollment numbers submitted to the Secretary were false, such submission could not have

been a "claim for payment" for purposes of the FCA.[7]  Ample caselaw from

analogous FCA contexts supports this conclusion.  *See Hopper*, 91 F.3d at 1266

(finding no FCA violation where the relator's complaint included allegations that a

school district inflated the enrollment of special education children, reasoning in

part that government funding did not directly depend on the number of enrolled

children); *United States v. Southland Mgmt. Corp.*, 326 F.3d 669, 675-76 (5th Cir.

2003) (finding no FCA liability where allegedly false reporting on Section 8

housing conditions to the Secretary of Housing and Urban Development would

lead only to a corrective action period—not to a loss in housing assistance

payments—reiterating that "[t]here is no liability under [the FCA] for a false

statement unless it is used to get [a] false claim paid."); *cf. Dookeran v. Mercy*

---

[7] To be clear, the court has not determined that Relator has sufficient evidence to prove that HCAP HS's enrollment numbers were false.  Indeed, it appears clear from Defendants' Supplemental Exhibit F, ECF No. 82-6, that any "ghost children" were timely replaced by qualified children on a waiting list such that actual enrollment was never below the funded enrollment of 1659.  *See* Kogami Decl. ¶¶ 4, 5, ECF No. 82-1 at PageID #1205 (explaining how HCAP HS maintained its funded enrollment levels by replacing vacancies with children from a waiting list, as set forth in Supplemental Exhibit F).  Moreover, Relator has no evidence contradicting the findings of the Head Start audits that found HCAP HS was fully complying with enrollment requirements.  *See* ECF No. 76-12.

That is, Relator has not produced sufficient evidence to rebut Defendants' explanation of the use of the term "ghost children."  Nor has she produced evidence that HCAP's actual enrollment ever fell below 97 percent of 1659—the threshold that could lead to a "chronic underenrollment" classification and a possible reduction in funding.  At best, she has produced incomplete and unauthenticated excerpts from transcripts of recordings of "team meetings" that refer, in an unknown context, to enrollment of 1500 or 1522 children.  *See, e.g.*, ECF No. 79-21 at Page ID #1162 and 1164.  But because there was no "claim for payment" for purposes of the FCA, any question of fact in this regard would not be a "genuine issue of material fact" for purposes of Rule 56's summary judgment standard for an FCA claim.

*Hosp. of Pittsburgh*, 281 F.3d 105, 109 (3rd Cir. 2002) (finding no possible FCA claim where "the [allegedly false] application was a request that Mercy be designated a clinical center" and "was not a request or demand for federal funds" but rather "was simply the first step in a process that ultimately might have led, but in actuality did not lead, to the authorization of the payment of federal funds").[8]

In short, Relator has not met her burden at this summary judgment stage to demonstrate a genuine issue of material fact as to Count One. There is no evidence of a "claim for payment or approval" under § 3729(a)(1)(A). Accordingly, the court GRANTS Defendants' Motion for Summary Judgment as to Count One.

> **2.** ***Count Two Fails for Lack of Evidence That Any Alleged Fraud Would Have Led to a Reduction in Head Start Funding, i.e., that it Would be "Material"***

Count Two fails for largely the same reasons that Count One fails.

Section 3729(a)(1)(B) does not create liability for *presenting* a "false or fraudulent

---

[8] For this reason—lack of a claim for payment—the court rejects Relator's belated invocation at the September 17, 2019 hearing of an "implied false certification" theory. *See Universal Health Servs. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 1999 (2016) (recognizing that an "implied false certification theory" can in some circumstances provide a basis for FCA liability, where submission of a claim for payment impliedly represents that there has been full compliance with material statutory, regulatory, or contractual requirements). If no claim for payment was submitted in the first place, there can be no "impliedly false certification" that the claim was in full compliance for purposes of the FCA. *See Hopper*, 91 F.3d at 1174 (reciting elements of a false certification FCA claim as "(1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, *causing (4) the government to pay out money or forfeit moneys due*") (emphasis added).

claim for payment or approval" (as does § 3729(a)(1)(A)).  Rather, it requires

making or using a false record or statement that is "material" to a false or

fraudulent claim, where the FCA defines "material" as "having a natural tendency

to influence, or be capable of influencing, the payment or receipt of money or

property."  31 U.S.C. § 3729(b)(4).  A cause of action under § 3729(a)(1)(B) "is

'complementary' to one under section 3729(a)(1)(A) and accordingly, 'the

elements for a count brought under section 3729(a)(1)(B) are practically identical

to the requirements for a count brought under section 3729(a)(1)(A).'"  *United

States ex rel. Scott v. Pac. Architects & Eng'rs (PAE), Inc.*, 270 F. Supp. 3d 146,

154 (D.D.C. 2017) (quoting *Pencheng Si v. Laogai Research Found.*, 71 F. Supp.

3d 73, 87 (D.D.C. 2014)).  Section 3729(a)(1)(B) was "designed to prevent those

who make false records or statements . . . from escaping liability solely on the

ground that they did not *themselves* present a claim for payment or approval."

*United States ex rel. Totten v. Bombardier Corp.*, 380 F.3d 488, 501 (D.C. Cir.

2004) (Roberts, J.).

     Allegedly false use of enrollment numbers cannot have been

"material" here because—under Head Start's statutory and regulatory scheme

explained above—those enrollment numbers would not "be capable of influencing

. . . the payment or receipt of money."  31 U.S.C. § 3729(b)(4).  Stated differently,

because the Secretary would have paid HCAP HS's grant regardless of the

enrollment submitted with the grant renewals (or submitted during monthly reporting), the enrollment figures were not material to payment.  *See, e.g.*, *Ebeid ex rel. United States v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010) ("[M]ateriality [under the FCA] is satisfied . . . only where compliance is 'a sine qua non of receipt of [government] funding.'") (quoting *Hopper*, 91 F.3d at 1267).  Even if lower enrollment might (or might not) eventually lead to a reduction in funding if underenrollment was not corrected or any funding reduction waived, the specific (alleged) falsehoods at issue here had no "tendency to influence, or [capability] of influencing, the payment or receipt of money or property."  31 U.S.C. § 3729(b)(4).

In *Escobar*, the Supreme Court held that "[t]he [FCA's] materiality standard is demanding."  136 S. Ct. at 2003.  "The False Claims Act is not 'an all-purpose antifraud statute,' or a vehicle for punishing garden-variety breaches of contract or regulatory violations."  *Id.* (quoting *Allison Engine Co. v. United States ex rel. Sanders*, 553 U.S. 662, 672 (2008)).

> A misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment.  Nor is it sufficient for a finding of materiality that the Government would have the option to decline to pay if it knew of the defendant's noncompliance.

*Id.* Given *Escobar's* reasoning, even the possibility that (allegedly) falsified enrollment figures could have allowed the Secretary to terminate HCAP HS's funding under 45 C.F.R. § 1304.5 (setting forth grounds allowing for termination of financial assistance, including failure to abide by terms and conditions of a grant) would not be enough to find "materiality." *See also United States ex rel. Kelly v. Serco, Inc.*, 846 F.3d 325, 334 (9th Cir. 2017) ("[T]he possibility that the government would be entitled to refuse payment if it were aware of [the] alleged violations is insufficient by itself to support a finding of materiality [under the FCA]").

In sum, because Relator has no evidence of a connection between the alleged fraud, and a claim for payment, the fraud cannot be "material" under § 3729(a)(1)(B). *See, e.g.*, *Lum v. Vision Serv. Plan*, 104 F. Supp. 2d 1237, 1241-42 (D. Haw. 2000) ("[A] mere regulatory violation would not give rise to a viable [FCA] action. . . . Absent express false certifications upon which funding is conditioned, the [FCA] provides no remedy.") (citing *Hopper*, 91 F.3d at 1267). Accordingly, Defendants are entitled to summary judgment on Count Two.

///

///

///

///

# V.  **CONCLUSION**

Relator has not met her burden of demonstrating a genuine issue of material fact as to all remaining counts of her Complaint.  Defendants' Motion for Summary Judgment, ECF No. 76, is GRANTED.  The Clerk of Court is directed to close the case file.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, Sept. 27, 2019.



 /s/ J. Michael Seabright
J. Michael Seabright
Chief United States District Judge

*United States ex rel. Lewis v. Honolulu Community Action Program, Inc.,* Civ. No. 16-00062 JMS-KJM, Order Granting Defendants' Motion for Summary Judgment, ECF No. 76